Bell, J.
This case was ably presented in the principal and supplemental briefs originally filed and oral arguments made previous to our opinion .heretofore announced; but other points are raised and authorities cited in the petition presented for a rehearing, which is denied, and, for a more orderly disposition of all the questions now herein involved, our original opinion is hereby withdrawn and substituted by the following:
The action was brought by the International Trust Company, appellee herein, as guardian of the minor heirs of Henry Confer, against the Modern Woodmen of America, appellant, a fraternal benefit society organized under the laws of the state of Illinois, and doing business in the state of Colorado under section 73, chapter 70, of the Revised Statutes of 1908. Said society has a lodge system with a ritualistic form of work, a representative form of government, and is self-governing in its administration, and, in the early part of the year 1909, organized a local camp at Globeville, Colo. On the 2nd day of February, 1909, Henry Confer, above named, made application to*said society for membership in said Globeville camp, and for a benefit certificate in the sum of $3,000.00, and, in said application, which was in writing, warranted that all statements and answers by bim made therein were full, complete and literally true, and especially agreed therein that the literal truth of each answer should be a condition precedent to any binding *29 contract issued upon the faith of such answer's, and agreed that they should become a part of the benefit certificate. In the last paragraph of said application, immediately preceding the signature of the applicant, his attention was especially called to the following notice:
“That inasmuch-as only the head officers of the society have authority to determine whether or not a benefit certificate shall issue on any application, and as they act upon the written statements, answers, warranties and agreements herein made, no statements, promises, knowledge or information had, made or given by or to the person soliciting, taking or writing this application, or by or to any person shall be binding on the society, or in any manner affect its rights, unless such statements, promises, knowledge or information be reduced to writing and presented to the head officers of the society at or before the time any benefit certificate shall be issued hereon; and I further agree that if any answer or statement in this application is not literally true, or if I shall fail to comply with or conform to any and all by-laws of the said Modern Woodmen of America, whether now in force or hereafter adopted, that my benefit certificate shall be void.”
On the same day, February 2nd, 1909, the applicant appeared before Dr. Van Landingham, the examining physician for the society, and, in answer to the questions contained in his application, purported to state his family history, his health condition, and habits. The answers thus made by him were written by the examining physician in the application, which was subsequently signed by the applicant, and represented, in substance, that he had not, in the last seven years previous to the date of his application, been treated by or consulted any person, physician or physicians in regard to personal ailments; that he never had any local disease, personal injury, or serious illness; that, at the time of the examination, he *30 was of'sound body, mind and health, free from disease or injury, and of good moral character and exemplary habits; that he did not use intoxicating liquors daily; that he had never been intoxicated; and that the kind and quantity of intoxicating liquors consumed by him was “an occasional beer.” On the 19th day of March, 1909, the appellant issued a benefit certificate to the applicant, on said application and the answers contained therein, and on April 11th, 1909, twenty-three days after issuing the same, the assured died from, fatty degeneration of the heart. The appellee, as guardian of the minor children of the assured, sought to collect from the appellant the sum of $3,000.00 as provided in the benefit certificate, and brought suit in the district court of the city and county of Denver for the amount. The appellant resists' payment of this certificate because, it avers, the assured made false statements in his application in regard to his health and habits, and that at the time he made such statements he had a disease of the heart, and was intemperate in the use of intoxicating liquors, which was the indirect cause of his death, and that such false statements and intemperance on the part of the assured, under the terms of his application and the by-laws of the society, render his certificate null and void. The appellee denies the above charges; and alleges that, if they are true, the agents and officers of the appellant society knew the actual condition of affairs at and before the time of issuing the certificate, and accepted from the assured his dues, premiums and fees with full knowledge of these conditions, and has, therefore, waived the conditions in this respect in the application, its by-laws and the certificate, and is estopped from asserting a forfeiture.
On the 12th day of April, 1909, Doctors Carlin and Bennett held an autopsy on the body of the assured, and were able to, and did, determine that the assured died from fatty degeneration of the heart; but were unable *31 to determine, from their examination of the body, the primary cause of the disease. Dr. Carlin testified that fatty degeneration of the heart is an affection which “causes the muscular fibres of the heart to change into fat surface and become friable and soft” so that the finger might be pushed through with very little effort, while the ordinary heart is tough, and that, in the case of the assured, the disease was in an advanced stage, and the heart reduced in size. He further testified that the primary cause of the disease is any wasting disease of the body, such as cancer, tuberculosis, alcoholism, and long sieges of typhoid fever, diphtheria, arsenical and phosphorous poisoning, and' Dr. Bennett adds to these torpidity of liver, poor circulation, bad digestion, and other things which tend to upset the heart. The witness Miller, a druggist,' testified that he thought the assured was suffering from heart trouble for some time before the date of his application, because of his bad complexion and complaints of dizziness, and had sold him strychnine tablets to relieve him of this trouble, but did not advise the assured that they were for this purpose. Another witness, Jennie Sardakovski, who was well acquainted with the assured and had business transactions with him, testified that about a year before his death, and again about two weeks previous thereto, she saw him taking tablets which, he told her, were for his heart. Dr. Lee •testified that he examined the assured for a policy in the Prudential Insurance Company about thirty days previous to his death, or seven days before the certificate in question was issued, and found his heart action to be very rapid. Counsel for appellant endeavored to have the witness state the cause assigned to him by the assured for this abnormal condition, but, upon objection of the appellee, the court refused to hear the testimony.
It also developed at the trial that for the last four and one-half years of the assured’s life he habitually in- *32 obliged in the nse of intoxicating liquors, using both beer and whiskey. Charles Newman testified that he knew the assured personally for a period of five years before his death; that they lived within three blocks of each other, and for weeks at a time he would see him daily, and at times he would not see him for a week or two; that whenever they met the assured took a drink of beer, and sometimes two, three or a whole lot more; that they both drank about the same, and would send for a can of beer and drink together; that it was a daily occurrence for the assured to drink beer when they were together, and, at times, but not frequently, the witness saw him under the influence of intoxicating liquors; that they both got drunk together, but not often; and that he, the witness, solicited applications for membership in the Grlobeville camp, but refused to take the assured’s application, because he was too much of a drinker, to his knowledge, for fraternalism. Michael Pishko testified that he worked for the assured for more than four years immediately prior to his death; that he drove the wagon in the mornings and cut meat in thp afternoons; and that, during this time, he drank whiskey and beer with the assured. His examination, in part, is as follows:
“Q. Did his habit of taking drinks extend over the whole period of four years that you knew him? A. Yes, sir.
“Q. Did he become intoxicated or under the influence of liquor? A. Under the influence? Yes, sir.
“Q. Did it (Conter’s drinking) cover this period generally, every day or every week? A. Yes, sir; I suppose he took his drink every day.”
Pishko also testified that he saw the assured drink beer the day he died. Jennie Sardakovski testified that the assured occupied the ground floor of her building and slept in a bunk behind the ice-chest, at least part of the time, for three years immediately prior to his death; *33 that she saw him nearly every day; that she saw him drinking whiskey and beer in the store; and that the year before he died he drank heavily some days, and some days he did not. C. Ml Hig’don testified that he was a Denver policeman on the beat where the assured did business and saw him almost daily for a period of four and a half years before his death; that the assured had the reputation of being, and was, a very heavy drinker, and was frequently intoxicated during this time; that he, the witness, was called upon to arrest the assured thrée different times for intoxication and disturbance; and that Such periods of intoxication occurred during the entire four and a half years that the witness knew the assured; that the assured, during the last six or eight months of his life, kept a jug of whiskey and a case of beer in his place of business and served it to his customers and drank with them; that he was a customer of the assured and drank with him several times, and at such times the assured drank more than he did, he generally taking but one drink while the assured took two or three; and that the assured was exceedingly liberal in treating his friends and customers.
The foregoing statement of the testimony convinces this court that no safe or conservative insurance company or society would have accepted this risk with knowledge of the excessive drink habits of the assured, as above detailed. In fact, appellee’s counsel made no special effort to refute the evidence of the dissipated practices of the assured, but rather defended on the ground that the appellant society received the application, initiation charges and legal fees of the assured, and accepted him, with full knowledge of his intemperate habits, and is therefore estopped from benefiting by his false answers. The majority of this court takes a different view of the evidence from that presented by appellee’s counsel. Dr. Van Landingham, examining physician for appellant, testi *34 fied that he had seen, but thought he had no acquaintance with, the assured at the time of the examination; that he read the questions from the application, and the assured answered yes or no, whatever was required, and he wrote the answers as they were given. There is no pretense that the answers were not written as the assured gave them. It is shown by Dr. Van Landingham that he was employed by the appellant society, through Mr. Hume, to make the medical examinations, but there is no evidence that he knew anything whatever about applicant’s drink habits. It is claimed, however, that Miller and Newman notified Hume of these habits. The testimony of Miller is that he “met him (Hume) when he first came out there to organize a lodge of Woodmen. * * * I think I was one of the first men that was consulted by Mr. Hume as a prospective member. * * * I told Mr.' Hume that Henry Conter was not a desirable member for the organization. * * * That he drank too heavilyj and I thought his heart was in bad condition.”
“Q. On what did you base your information that you gave Mr. Hume, as to his being a heavy drinker? A. Personal observation, I guess.
“Q. You knew that to be a fact? A. I knew that he drank more than I would want to drink.
“Q. Well, in your opinion, he drank so much that you suggested that he was not a fit person, because, as one of the reasons, that he was a heavy drinker? A. Yes, sir.”
The witness Newman testified as follows:
“I came in there (Conter’s store) to write a party up, and I wrote him up, and he came up and started to ball me up about insurance, and I said ‘You need not talk about it. I would not have you in the Modern Woodmen or any other lodge. ’
“Q. I mean between you and Mr. Hume. A. Well, that happened about two weeks afterwards. I told him I *35 -would not write him up, for I was — he was telling me that he is paralyzed.
“Q. What reason did you give for not writing him up ? A. That he was too much of a drinker, to my knowledge, for fraternalism.”
It is difficult for us to see how the statement made by Newman could have made any substantial" impression upon Hume as to assured’s drink habits. Newman seems to have been a hosom companion of the assured, and stated in his testimony that they were frequently associating and drinking together, and got drunk together, but not often, and that they both drank about the same. If the witness considered the assured too much of a drinker for fraternalism, we are unable to see how he could have regarded himself as a fit member for fraternalism. From the relations existing between Newman and the assured, the remark made in reply to the assured’s “hailing up” the witness would appear very inconsistent and unnatural, unless made in a mere spirit of pleasantry between two intimate friends.
After creditable efforts were exerted by counsel for appellee to obtain some fact that was put into the possession of Hume showing the intemperate habits of the assured, they dismally failed. Confer was sent to the examining physician and told him, in substance, that his habits were exemplary; that he never had been intoxicated ; that he did not use intoxicating liquors daily, and that the kind and quantity of intoxicating liquors consumed by him was an occasional beer. The statement made by Miller to Hume that the assured drank too heavily, and the statement of Newman to Hume that the assured “was too much of a drinker, to (his) knowledge, for fraternalism” were vague opinions of the witnesses which did not necessarily conflict with the statements of the assured in his medical examination. Either of the witnesses, for aught we know, may have thought that *36 “an occasional beer” was drinking too heavily, or Newman may have thought “an occasional beer” made the assured “too much of a drinker for fraternalism.” Neither of the answers of these witnesses gave Hume any idea of the amount or quality of intoxicating liquors consulted by the assured or the frequency of his indulgences. They were mere hazy opinions bottomed on no facts disclosed in the record at least, and, in our opinion, under the condition of the record, no rule of ordinary diligence required the appellant to pursue its investigation beyond the medical examination. It will also be observed that the opinion of Newman was not expressed to Hume until two weeks after the assured “balled up” the witness for insurance, and there is neither evidence nor presumption that the physician’s examination and the acceptance of the application were not then completed. There is a great dearth of evidence as to the position of the agent Hume. At the trial, counsel for appellee requested that counsel for appellant admit that Humé “was an assistant of the deputy head consul.” Counsel for appellant replied: “He was assistant deputy of the head consul with the limited power, only, to solicit members.’’ Counsel for appellee then said: “We want to offer especially out of the by-laws of the defendant chapter 27, consisting of sections 210 to 222, inclusive,” which were admitted, showing the authority possessed by head and deputy head consuls, but make no reference to the authority of an assistant of such deputies. They gave deputy head consul authority to solicit members and organize local camps when and wherever the head consul might direct, and permitted him to collect and retain the membership fee of not less than $5.00 for his services, and to solicit members for organized camps, when short of members, on the same terms. Counsel for appellee, in argument, speak of the organization of the Grlobeville camp by Hume; however, the evidence *37 does not bear this out. The record shows that Hume secured Dr. Yan Landingham as examining physician for the camp, consulted with Miller when he first arrived about the organization of said Camp, solicited and obtained the applications of Miller and the assured, and this is about the extent of his participation in the business of the organization found in this record. There seemed to be a contention of counsel as to whether he really organized the camp. Counsel for appellee intimated that he did, while counsel for appellant insisted that he did not, and each of the parties tried to establish its contention by the evidence of A. W. Miller, who was elected clerk of the local camp at the time of its organization. Appellee’s counsel asked the witness:
<£Q. You do know, however, that he was the man who organized the local camp * * * ? A. He is the man who took my application. ’ ’
Counsel for appellant later asked:
££Q. Mr. Miller, as a matter of fact, Mr. Hume did not organize the camp, did he? A. I do not believe that I said he did, did I?”
There is no adequate proof that the agent Hume organized the local camp or had any authority to do more than select the examining physician, solicit applications and forward them to the head officers of the society; and, if wé are to be governed by Miller’s testimony, we should conclude that he did not organize the local camp.
With this condition of the record before us, it is insisted that the society had knowledge, through its agents Miller and Hume, of the impaired health and intemperate habits of the assured, and, therefore, the law of waiver and estoppel operates in favor of the appellee. We' are not prepared to admit the knowledge of the society as contended, hut, even though it had been shown to our satisfaction that Miller and Hume had this knowledge, the appellee, under the authorities and in view of the wilful *38 misrepresentations of the assured, could not benefit by the fact, for it is said in 2 Bacon on Ben. Soc. & L. Ins., 3rd ed., sec. 434-a, that:
“It is an elemental rule that where the means of knowledge are equal there can be no estoppel, nor can estoppel exist without some act of the party estopped misleading the other to his disadvantage.”
In Ketcham v. The Am. Mut. Acc. Assn., 117 Mich., 521, 76 N. W., 5-6, the supreme court of Michigan said:
“The courts have always been anxious to take care of the rights of the assured when the applicant had relied upon the agent informing the company what had been truthfully told to him about the character of the risk; but the courts never have said the company is bound by statements contained in an application, when not only the agent, but the assured knows they are untrue, and calculated to deceive, and the application is to be forwarded to the company as the basis of its action. To so hold would put these organizations completely at the mercy of dishonest and unscrupulous agents.”
See, also, Ins. Co. v. Fletcher, 117 U. S., 519, 6 Sup. Ct., 837, 29 L. Ed., 934; M. W. of A. v. Owens, 130 S. W. (Tex.), 860; Hexom v. Maccabees, 140 Iowa, 41, 117 N. W., 19; Kempe v. W. O. W. (Tex. Civ. App.), 44 S. W., 688, 14 L. R. A. (N. S.), 280, note; Bonewell v. N. Am. Co., 160 Mich., 137, 125 N. W., 61; S. C. on rehearing, 167 Mich., 274, 132 N. W., 1067, Ann. Cas., 1913A, 847; Loftin v. Benev. Assn., 9 Ga. App., 121, 70 S. E., 353; Mudge v. I. O. F., 149 Mich., 467, 112 N. W., 1130, 14 L. R. A. (N. S.), 279, 119 Am. St. Rep., 686; Collins v. Co., 32 Mont., 329, 80 Pac., 609, 1092, 108 Am. St. Rep., 578; Wilhelm v. Columbian Knights, 149 Wis., 585, 136 N. W., 160; Mc-Greevy v. Nat. Union, 152 Ill. App., 62; Dimick v. Co., 69 N. J. Law, 384, 55 Atl., 291, 62 L. R. A., 774; Maier v. Co., 78 Fed., 566, 24 C. C. A., 239; Mattson v. Samaritans, 91 Minn.. 434. 98 N. W., 330.
*39 It is intimated by counsel for appellee that Hume was influenced in soliciting the membership of the assured by reason of the fee attached, and from this they argue that if the society is thus dominated by a desire on the part of its officers for fees and salaries, the members of the society should pay such claims as the one here presented.
It is said by the supreme court of Washington in Elliott v. Knights of the Modern Maccabees, 46 Wash., 320, 89 Pac., 929-930, 15 L. R. A. (N. S.), 856, that, if a person colludes with an agent to cheat the principal, the latter is not responsible for the act or knowledge of the agent, for the rule which charges the principal with what the agent knows is for the protection of innocent third persons, and not those who use the agent to further their own fraud upon the principal. It is there held that, while notice to an agent is notice to his principal as a general rule, an exception to this rule arises when the agent’s conduct is such as to raise a clear presumption that he will not communicate to his principal his knowledge of the fact in controversy, and where he acts in his own interests and adversely to those of his principal. In the case there under consideration the age limit for membership was fifty years, and Elliott informed the deputy commander that he was fifty-five years of age. The deputy asked him to state his age as of fifty years, and promised to secure his admission. The suggestion was acted upon, Elliott was admitted and remained a member of the tent until he had paid in dues the sum of $348.00 and was entitled to certain returns under the rules. It was then discovered that he had misrepresented his age, the society canceled his membership; he sued to recover the above stated amount, and the court held that he and the agent were working for their own interests, and neither of them for the interests of the society, and denied his right to a return of the dues paid by him. See also Ryan *40 v. World Mut. L. I. Co., 41 Conn., 168, 19 Am. Rep., 490; Hanf v. N. W. Masonic Aid Assn., 76 Wis., 455, 45 N. W., 315; 1 Enc. of Law, 2nd ed., 1144-1145.
However, we have found that there is no substantial evidence showing that the agent Hume had knowledge of the falsity of the statements. But, if we should concede his knowledge, it could not excuse the culpability of the assured, and the trial court should have granted the request of appellant for an instruction to the jury that it return a verdict for the defendant.
The foregoing conclusion is sufficient to dispose of this case, and we feel that it is unnecessary for us to go beyond thisbut the case has been so ably and exhaustively argued on both sides, and so many authorities have been produced pro and con, and such persistent demands have, been made in counsel’s argument for a rehearing, that we feel constrained to' present some of the points urged and authorities cited in support thereof, if for no other purpose than that the bench and bar may have the benefit of the researches of counsel.
It will be seen from a quotation from the application of the assured in the early part of this opinion that a policy should issue only upon the written statements, answers, warranties and agreements made in the application, and that no statements, promises, knowledge or information had, made or given by or to the person soliciting, taking or writing the application should be binding upon the society or in any manner affect its rights, unless such statements, promises, knowledge or information were reduced to writing and presented to the head officers of the society at or before the time any benefit certificate should be issued thereon, and that the certificate should be void if any of the statements contained in the application, which were made warranties in toto, should not be wholly true. This notice of the limited character of the soliciting or other agents of the com *41 pany appeared in large type in the application immediately above where the assured signed the same, with a headline printed in large capital letters as follows: “APPLICANT WILL PLEASE NOTE THIS CLAUSE,” thereby using every endeavor on the part of the society to bring the limited authority of the agents to the notice of the assured. Prior to March 29th, 1886, when the supreme court of the United States announced its opinion' in the case of New York Life Ins. Co. v. Fletcher, 117 U. S., 519-536, 29 L. Ed., 934, 6 S. C. Rep., 837, on an application similar to the one under 'consideration, the courts showed a tendency to hold that the knowledge of the agent was the knowledge of the company, regardless of the attempts of companies to limit the authority of agents; and, with many courts, there seemed to be no discrimination made between the decisions cited from courts of states where the legislatures had specially provided that “persons soliciting insurance or procuring applications therefor should be held to be the agents of the insurance companies, anything in the application or policy to the contrary notwithstanding, ” as in the state of Iowa, Laws of 1880, Chap. 211, p. 209, and those where the general principles of agency only, without any statutory restrictions, were involved.
Justice Field, in writing the opinion in the Fletcher case, supra, disregarded all authorities where the agent’s authority was not limited, and said that in cases where the agents were not limited in their authority they would be deemed as acting for the companies, but where the power of the agent was limited, and notice of such limitation given to the applicant in the application, which he was required to make and sign and which he must be presumed to have read, he would be bound by such limitation, and that there .was nothing in insurance contracts which distinguished them in this particular from others. He further said that, if the assured had read even the *42 printed lines of his application, he would have seen that it stipulated that the rights of the company could in no respect be affected by the agent’s verbal statements, unless reduced to writing and forwarded with the application to the home office; that the company, like any other principal, could limit the authority of its agents and thus bind all parties dealing with them with knowledge of such limitation; and that it must be presumed that the applicant read the application and was cognizant of the limitation therein expressed, when the notice was so clearly brought to his attention.
In Iverson v. Met. Life Ins. Co., 151 Cal., 746, 91 Pac., 609-612, 13 L. R. A. (N. S.), 806, the supreme court of California had the same question under consideration, and held that, when a soliciting agent takes an insurance application in which it-is stipulated that the answers of the applicant are true and are the basis of the contract of insurance; that, if untrue, the policy should be void; that only officers of the insurer had authority to determine whether a policy should issue; and that no statement made to the soliciting agent should be binding on the insurer, unless reduced to writing and presented to the officers of the company at the home office, the company would not be held liable on the policy issued on such application, unless informed as provided therein. In that case the agent of the company solicited an application from Iverson, whom he had known for over two years, and knew that he had suffered a stroke of paralysis, but this information was not communicated to the general agent of the company; the assured stated in his application that he never had paralysis, and the court declared the policy void, and held that, under the conditions of the application, the knowledge of the soliciting agent was not the knowledge of the company. It further held that an insurance company, like any other principal, could prescribe limitations upon the power and authority *43 of its agents, and persons dealing with, such agents, with notice of the limitations upon their authority, are hound by the restrictions imposed; and that in the case before it the assured was plainly informed in the application that only the officers at the home office had authority to determine whether a policy should issue on the application, and that they acted on the written statements, answers, warranties and agreements contained therein in determining the matter.
In Dimick v. Met. Life Ins. Co., 69 N. J. L., 384, 55 Atl., 291, 62 L. R. A., 779-780, involving the same questions of limitations of agencies as were considered in the Fletcher and Iverson cases, the court said the company certainly was at liberty to limit the powers and authority of its own agents, and third parties dealing with such agents, with express notice of the limitations thus imposed, could not bind the principal by any act done by the agents in excess of the bounds of their authority; that, if a similar question were raised concerning a contract relating to any other subject matter, not the slightest doubt would be entertained with respect to the binding force of the limitation; and, if persons seeking insurance, and insurance companies, are to be left free to enter into such contracts as they please with reference to life insurance, it is difficult to find any ground on which to ignore the force of these express stipulations, and, if there is any public policy' requiring a rule different from that applicable to other subjects, it is for the legislatures, and not for the courts, to declare it.
See also, to the same effect: Northern Assur. Co. v. Grand View Bldg. Assn., 183 U. S., 308, 22 Sup. Ct., 133, 46 L. Ed., 213; McCoy v. Met. Life Ins. Co., 133 Mass., 82;, Clemens v. Sup. Assembly, 131 N. Y., 485, 30 N. E., 496, 16 L. R. A., 33; Rinker v. Aetna Life Ins. Co., 214 Pa., 608, 64 Atl., 82-84, 112 Am. St. Rep., 773; Cleaver v. Ins. Co., 65 Mich., 527, 32 N. W., 660, 8 Am. St. Rep., 908; *44 Cook v. Standard L. & Acc. Ins. Co., 84 Mich., 12, 47 N. W. 568-571; Ketcham v. Am. Mut. Acc. Assn., 117 Mich., 521, 76 N. W., 5, 6; Modern Woodmen of Am. v. Tevis, 117 Fed., 369-378, 54 C. C. A., 293; National Union v. Arnhoist, 74 Ill. App., 482-489; Elliott v. Knights of the Modern Maccabees, 46 Wash., 320, 89 Pac., 929-930, 13 L. R. A. (N. S.), 856; Sun Fire Office v. Wich, 6 Colo. App., 103-113, 39 Pac., 587.
Counsel for appellee, in their petition for a rehearing, contend that our supreme court, in the case of Supreme Lodge K. of H. v. Davis, 26 Colo., 252-259, 58 Pac., 595, decided the question of agency .contrary to the con-elusions which we here hold. We have re-examined the Davis case and are satisfied that the facts therein considered involved the ratification of the acts of an agent. The facts before us involve the power of an insurance company to limit the authority of its. agents and bind the assured by bringing notice of such limitation to him in the application which he is required to sign. We have also carefully examined the cases of McGurk v. Met. L. Ins. Co., 56 Conn., 528, 16 Atl., 263, 1 L. R. A., 563; Coolidge v. Life Ins. Co., 1 Mo. App., 109, and 1 Bacon Ben. Soc. & Life Ins., sec. 160, authorities relied upon by our supreme court in the Davis case, all of which recognize the general rule that notice to the local agent of an insurance company, in making application for insurance, is notice to the company. The force of this general rule is not denied, and is not before us for consideration; but the question here presented is, as before stated, whether an insurance company can create an exeejition to the general rule by limiting the authority of its agents and giving notice of such limitation to the applicant in the application, which is part of his contract and which he is required to make and sign, as was done in that part of the application before us .heretofore recited. Our supreme court, in the Davis case, made no pretense of con-
*45 sidering such a question, nor are the authorities relied upon hy it applicable to the facts before us. In the case of Ryan v. The World L. Ins. Co., 41 Conn., 168-173, 19 Am. Rep., 490, cited with approval in the Fletcher case, supra, the supreme court of errors of Connecticut passed upon facts similar to those we are now considering, and held that such a limitation and notice was binding on the assured, and, in the case of Ward v. Met. L. Ins. Co., 66 Conn., 227-240, 33 Atl., 902, 50 Am. St., 80, the same court distinguished the McGurh case, cited by our supreme court as an authority in the Davis case, and again recognized the exception which is here presented. 1 Bacon, sec. 160, relied upon by our supreme court, merely states the general rule, but, in a foot-note thereto, also recognizes the exception as follows:
“But when the policy limits the authority of the agent, there is nó presumption that such agent communicated his knowledge to the company.”
Further, when the Davis case was being considered, the case of Sun Fire Office v. Wich, 6 Colo. App., 113, 39 Pac., 587,-and also the- Fletcher case, supra, had been decided, both recognizing the right of the insurer to limit the authority of its agents and bind the assured by giving notice of such limitation in the application which was made a part of the contract or policy, and no reference whatever was made to either of these authorities by our supreme court in the Davis case. From the painstaking industry and learning of the justice of our supreme court who wrote the opinion in the Davis case, it cannot; be presumed that he overlooked or ignored the settled doctrine supported by the Ryan and Ward cases, the footnote to sec. 160 of 1-Bacon, the opinion of our own court of appeals in the Wich case, or that of the United States supreme court in the Fletcher case.
But it is contended by appellee that our supreme court, in the case of Pacific Life Co. v. Van Fleet, 47 *46 Colo., 401, 107 Pac., 1087, repudiated the doctrine of the Fletcher case and that we err in considering it as an authority here. A mere glance at the Van Fleet case will convince anyone that the facts there are essentially different from those in the case at har, and that our supreme court distinguished the facts in that case from those in the Wich and Fletcher cases rather than repudiated the legal principles declared in the latter cases. The court expressed itself as follows:
“The Fletcher case is cited with approval by our court of appeals in the Wich case. The facts of these cases may be, in one or two important particulars, distinguished from the facts of the case at bar. But whatever may be said of their doctrine, we do not think they are controlling under the facts of this case, and we cannot apply their doctrine.”
In the Van Fleet case the soliciting agent of the company, who had power to solicit, prepare and transmit applications for insurance, filled in the blank spaces in the application and inserted therein answers which he knew to be false. The court said:
“It would seem that decisions of the supreme court of the United States of a later date than the Fletcher case, and certainly our own decisions, make the soliciting agent the representative of the insurer when he makes out the application himself, and his knowledge the knowledge of the defendant, and estop the company to declare the policy void because of the mistake or fraud of its agent.”
In the case at bar the soliciting agent, Hume, did not insert in the application the answers complained of. The false answers therein were made by the assured himself to the examining physician and written, as given, in the application by the examining physician, who was a stranger to the assured, and knew nothing whatever of his habits or the falsity of his answers. In this respect, *47 particularly, the Van Fleet case differs materially from the case, at bar, and is in no way applicable to the facts before us. 1 -
It would seem that the learned justice who wrote the opinion in the Van Fleet case had some doubts as to the attitude of the United States courts toward the doctrines announced in the Fletcher case. However, the subsequent decisions of the United States courts have followed and applied these doctrines and very generally distinguished the Chamberlain, Wilkinson and Fletcher cases, as is shown in Northern Assur. Co. v. Grand View Building Assn., 183 U. S., 308-358, 22 Sup. Ct., 133, 46 L. Ed., 213, wherein the Fletcher case is expressly approved, largely quoted from and followed; Sawyer v. Equitable Co. (C. C.), 42 Fed., 30; Mutual Co. v. Robison (C. C.), 54 Fed., 580-595; Standard L. & Acc. Co. v. Fraser, 76 Fed., 705, 22 C. C. A., 499; Maier v. Fid. & Mut. L. Assn., 78 Fed., 566, 24 C. C. A., 239; Hubbard v. Mut. Reserve (C. C.), 80 Fed., 681; Glover v. Nat. Fire Ins. Co., 85 Fed., 125, 30 C. C. A., 95; Brown v. Casualty Co. (C. C.), 88 Fed., 38-41; U. S. Life Ins. Co. v. Smith, 92 Fed., 503-507, 34 C. C. A., 506; Caruthers v. Kansas Mut. L. Ins. Co. (C. C.), 108 Fed., 487-494; John Hancock L. Ins. Co. v. Houpt (C. C.), 108 Fed., 572-576; Modern Woodmen v. Tevis, 117 Fed., 369, 54 C. C. A., 293, and Phoenix Ins. Co. v. Warttemberg, 79 Fed., 245-248, 24 C. C. A., 547.
In the Warttemberg case, supra, the circuit court of appeals clearly announced that the decision of the court in the case of Insurance Co. v. Chamberlain, 132 U. S., 304, 33 L. Ed., 341, 10 S. C. Rep., 87, did not attempt to modify the doctrine of the Fletcher case, and said that it was based expressly upon the statute of Iowa, in which state the contract of insurance had been made, providing that “any person, who shall hereafter solicit insurance or procure applications therefor shall be held to be the soliciting agent of the company or association issuing the *48 policy on such application or on a renewal thereof, anything in the application or policy to the contrary notwithstanding.” 1
The court further said:
“We find no other decision of the supreme court subsequent to the Fletcher case which in any way modifies .that case.”
It is rather surprising that anyone who read the Chamberlain case should have thought that such was intended, in anywise, to modify the Fletcher case. Justice Harlan, who wrote the opinion in .the Chamberlain case, expressly stated that counsel upon one side insisted that the Fletcher case controlled, and counsel upon the other side insisted that other decisions of the United States supreme court controlled, and he held that the statute of Iowa controlled, and based the decision thereon, and anything he said in the previous part of the ,opinion about general rules is obiter dictum and not authority upon any question.
Justice Campbell, in the Van Fleet case, made no pretense of overruling the doctrine laid down in the Fletcher case, adopted by our court of appeals with approval in • the Wich case, to the effect that it is competent for any party, corporation or individual, employing an agent in the negotiation of a contract, whether of insurance or otherwise, to limit his power, provided the limitation is brought home to the knowledge of the other contracting party, and, that in an insurance application, which the assured is required to sign, such notice may be brought to the attention of the assured therein.
In Merchants Ins. Co. v. Harris, 51 Colo., 109, 116 Pac., 143, our supreme court said “insurers should undoubtedly be allowed to protect themselves, in any legal way possible, against the fraud of their unfaithful agents, but not at the expense of innocent third parties. And when a loss caused by a dishonest agent must fall upon *49 his principal or,a third party, both equally innocent, the courts should not, and do not, ordinarily, hesitate in putting the burden upon the person who selected and controlled the agent. ’ ’
It would seem from the foregoing stated conditions that neither the facts nor decisions in the Van Fleet or Harris cases affect those parts of the Wich or Fletcher case which apply to the facts of the case at bar, if it was the intention of, our court to repudiate anything decided in either of these cases, and we, therefore, regard them as authority herein.
We may say here that the authorities herein cited and examined by us support the following principles:
First, contracts of insurance are to he considered and construed, when not controlled by statute, by the same rules of law and interpretation as other contracts in order to carry out the intention of the parties. — Merchants Ins. Co. v. Harris, supra, 108.
Second, under the general principles of the law of agency, an insurance company, when not restricted by statute, is at liberty to 'limit the authority of its own agents, and an applicant dealing with an agent whose authority is so limited by the express terms of the application, which the applicant is presumed to read and required to sign, cannot benefit by any act done by such agent in excess of his authority so limited and declared. —Dimick v. Met. L. Ins. Co., 69 N. J. L., 384, 55 Atl., 291, 62 L. R. A., 781-782; Sun Fire Office v. Wich, supra, 113-114, and other cases heretofore cited.
Third, if the people of any state wish to change the public policy thereof in insurance matters, by limiting the general rule of agency, it is for the legislatures, and not for the courts, to so change it. — Dimick and Wich cases, supra.
Counsel for appellee, in their petition and brief for a rehearing, also complain, because, they say, that the *50 authorities overwhelmingly show, in a case like this, that the company must plead and tender a return of the dues and assessments paid. We did not go into this question exhaustively, as it was not raised in the court below, nor in this court until after the case had been orally argued; and, under such conditions, unless it is necessary to prevent injustice from prevailing, the courts are not inclined to consider any questions which are so untimely presented. However, in onr opinion heretofore announced, we did cite the case of Elliott v. Knights of the Modern Maccabees, 46 Wash., 320, 89 Pac., 929-930, 13 L. R. A. (N. S.), 856, wherein the assured defrauded the society, by collusion with the agent, in obtaining a policy, and paid $348 in dues and assessments before the society discovered the fraud and canceled his policy or certificate. Upon action brought by him to recover the dues and assessments so paid, the supreme court of Washington held that, where the policy was obtained by fraud on the part of the applicant, or by collusion between the applicant and the agent, he forfeited all payments. In Nat. M. F. Ins. Co. v. Duncan, 44 Colo., 472-480, 98 Pac., 634, 20 L. R. A. (N. S.), 340, our own supreme court settled the question in this jurisdiction in the following language :
‘ ‘ Counsel for plaintiff also contends that the defense under consideration is insufficient because it does not allege that the company has repaid the premium or any part thereof to the insured. The company is not seeking to rescind its contract of insurance, but to avoid liability thereon because of the fraud of the insured. Where a policy by its terms is void by reason of fraud on the part of the insured, the premium cannot be recovered back.”
See also Aetna L. I. Co. v. Hall, 10 Ill. App., 431; Freismuth v. Agawan M. F. I. Co., 64 Mass., 588; 2 May on Ins. (4th ed.), sec. 567.
The general rule is stated in a footnote to Taylor v. *51 Grand Lodge A. O. U. W., 96 Minn., 441, 105 N. W., 408, 3 L. R. A. (N. S.), 114, as follows:
“The general doctrine laid down by the test-book writers is that an unintentional breach of warranty on the part of the insured does not authorize a retention of the amount paid as assessments, if no risk has been run by the insurer; but actual fraud in the inception of the contract on the part of the insured forfeits his claim to a return of assessments notwithstanding the fact that no risk has ever attached. See 2 Cooley, Briefs on Insurance, pp. 1037-1048; Niblack, Accident Ins. & Ben. Soc., sec. 282; Vance, Ins., secs. 85, 86; Joyce, Ins., sec. 1406; Cooke, Life Ins., p. 193; 2 May, Ins., 3rd ed., sec. 567.”
In the case under consideration we have found that the policy or certificate was obtained by wilful misrepresentations on the part of the assured as to his intemperate habits, hence no such tender or pleading as is insisted upon by the appellee was required. Furthermore, we can find no direct evidence in the record as to the payment of any specific amount by the assured, but there are acknowledgments of the payment of whatever amounts that were necessary to admit the assured as a member, and, by consulting sec. 214 of the by-laws, we learn that the payment of a membership fee of at least $5.00, together with the camp and head physician’s fees, was required, and from this it is self-evident that the assured had invested but a very small amount for the certificate in question; and we feel, in view of the condition of the record before us, that we would be doing a great injustice to require the members of the appellant society to pay the judgment of $3,190 rendered in the district court on a certificate that was evidently obtained by wilful concealment of material facts, and which could not have been secured if a truthful statement of the intemperate habits of the assured had been made, or if the society had knowfi of the impaired health of the assured at the time the *52 certificate in question was issued, and when lie accepted said certificate, April 5th, 1909, twenty-three days before his death, upon an express warranty over his own signature to the effect that he was then in good health and agreed that the same should not be binding on the society unless he was then in good health.
We think, upon the evidence, which was practically undisputed, that it was the duty of the trial court to give the instruction requested by the appellant directing the jury to return a verdict in its favor; hence, the judgment is reversed, the case remanded, and the district court directed to enter judgment for costs in favor of the appellant and dismiss the ease.

Reversed and Remanded, With Directions.

Hurlbitt and Morgan, JJ., dissenting.